HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE EUGENIA ALLEN-VRABLIK,<br><br>    Debtor.<br><br>DAVID VRABLIK & EUGENIA ALLEN-VRABLIK,<br><br>    Plaintiffs-Appellants,<br><br>    v.<br><br>HSBC BANK & ONEWEST BANK, FSB,<br><br>    Defendants-Appellees. | BANKR. NO. 08-16706TWD<br><br>ADV. PROC. NO. 10-1100TWD<br><br>CASE NO. C12-1369RAJ<br><br>ORDER |

## I. INTRODUCTION

This matter comes before the court a second time on an appeal from David Vrablik and Eugenia Allen-Vrablik of a final judgment of the bankruptcy court dismissing the Vrabliks' claims against HSBC Bank and OneWest Bank.  For the reasons stated below, the court AFFIRMS the bankruptcy court.  The clerk shall TERMINATE both this appeal and the motion calendar associated with it, but it shall not enter judgment at this time. This order concludes with instructions to the parties to consider negotiating an agreement that would permit the Vrabliks to maintain ownership of their home.

ORDER – 1

## II.  BACKGROUND & ANALYSIS

The Vrabliks were victims of a scam.  Trying to save their King County home from foreclosure, they turned to a shyster named Raymond Sandoval.[1]  Mr. Sandoval and his cohorts purported to offer the prospect of "rescue" from foreclosure.  Instead, they deprived the Vrabliks of all of the equity in their home while lining their own pockets.  They also dramatically increased the debt to which the Vrablik property was subject.  At the time the scheme began in 2005, the Vrabliks owed just under $200,000 on their existing mortgage.  By the time the scheme ended, their home was encumbered by deeds of trust securing at least $550,000 in loans.  There seems to be no dispute that their home is worth less.  HSBC and OneWest now own those loans and are the beneficiaries of the deeds of trust.  This appeal concerns who, between the banks and the Vrabliks, will bear the financial consequences of the scam.  The answer is that they both will.  The more specific answer is that the bankruptcy court correctly ruled on summary judgment that the Vrablik's property is subject to the banks' deeds of trust.  To understand that answer, the court summarizes the record as it pertains to the scam and its aftermath.

**A.   In Two Transactions, the Vrabliks Sell Their Home in Exchange for An Option to Repurchase It.**

Finding themselves in dire financial straits, the Vrabliks declared bankruptcy in 2005 with the "assistance" of Mr. Sandoval.  Mr. Sandoval brokered a deal where third parties (Dwarka Krishna Addepalli and Valli Addepalli) purchased the Vrabliks' home, thereby wiping out the Vrabliks' existing debt.  To finance the transaction, the Addepallis took out two loans totaling about $350,000 and secured by deeds of trust.  So far as the record reveals, Mr. Sandoval and his associates pocketed the approximately $150,000 difference between the Vrabliks' existing debt and the amount of the new loans.

---

[1] Mr. Sandoval is a member of the Washington State Bar Association ("WSBA").  The court takes judicial notice that he is presently suspended from the practice of law.  Because his suspension is the result of a stipulation he reached with the WSBA, the court cannot be certain whether the WSBA is aware of his conduct with respect to the Vrabliks.  The court will forward both this order and its May 14, 2013 order to the WSBA, along with a cover letter requesting that the WSBA investigate and ensure that Mr. Sandoval faces appropriate discipline.

ORDER – 2

The Vrabliks insist that they entered an agreement with the Addepallis that would have permitted them to repurchase their home within two years. There is no documentary evidence of that agreement – the only written agreement in the record between the Addepallis and the Vrabliks is a standard real estate purchase contract. There is, however, evidence that the Vrabliks entered some agreement with the Addepallis other than the purchase contract. In May 2006, the Addepallis sent the Vrablik's a "Notice of Non-Payment" that recited that the Vrabliks owed $4,600 in unpaid monthly "dues" and associated late fees. The notice also quoted passages from a real estate contract that is not otherwise in the record. Because the bankruptcy court's rulings came on summary judgment, where it was obligated to construe the evidence in favor of the Vrabliks, the court assumes for purposes of this order that the Vrabliks are correct in their assertion that they had an option to repurchase to their home.

Although the Vrabliks cured their May 2006 default on their agreement with the Addepallis, Mr. Sandoval nonetheless reappeared to "rescue" them once again. In August 2006, he introduced another third party, Clayton Pate, and presented the Vrabliks with an "Agreement for Deed." The Agreement for Deed is, much like the agreement that the Vrabliks contend that they entered with the Addepallis, an agreement that allowed the Vrabliks to repurchase their home within two years, provided they made monthly payments to maintain their option. The Agreement for Deed recites facts about the Vrabliks' property that were probably wrong. It states, for example, that the Vrabliks had a mortgage on their property and were "in danger of defaulting and having the property foreclosed." Agr. for Deed, Recital C. There is no evidence that the Vrabliks had any interest in their property other than the option to repurchase from the Addepallis. The Agreement for Deed also states that the Vrabliks entered the Agreement "for the purpose of selling and repurchasing the property as a viable alternative to avoid foreclosure and loss of the property." *Id.*, Recital D. The Agreement also recites that Mr. Pate "will procure a mortgage" against the property "for the purpose of execution of [the

ORDER – 3

Agreement]." *Id.*, Recital L.  The Agreement required Mr. Pate to make payments on "[t]hat lien held by dated August 15, 2006 recording number(s): , King County Washington." *Id.*, p. 4 of 14.  The court reproduces that statement precisely as it appears in the Agreement for Deed.  The court takes judicial notice that there is no lien or any other obligation in the records of the King County Recorder's Office dated August 15, 2006, and that no party has suggested that an August 15 lien existed.  Nonetheless, the Agreement for Deed declared that it was "subordinate to all existing mortgages and Deeds of Trust on the property and to all extensions, renewals, or replacements thereof." *Id.*, p. 4 of 14.

The court pauses here to summarize the Agreement for Deed.  It acknowledges the existence of a prior lien on the property.  It acknowledges Mr. Pate's intent to obtain a new mortgage on the property.   It acknowledges that the new mortgage would replace any existing mortgage or deed of trust.  And finally, it acknowledges that the Agreement for Deed itself is subordinate not only to any existing mortgage or deed of trust, but to any "extension[], renewal[], or replacement[]" of those mortgages or deeds of trust.

Mr. Pate did replace the existing liens on the property (the Addepallis' deeds of trust) with two new deeds of trust that he (and his wife) entered at the same time he entered the Agreement for Deed.  The beneficiary of the deeds of trust (which secured obligations of $440,000 and $110,000, respectively) was MortgageIt, a lender that apparently no longer exists.  The record reflects that Mr. Pate lied repeatedly to MortgageIt by declaring that he either occupied the property or would occupy the property within 60 days of the closing of the transaction.  There is no evidence that anyone disclosed the Agreement for Deed to MortgageIt, and there is no dispute that no one recorded the Agreement for Deed prior to the closing of the loans.[2]

---

[2] In November 2006, months after the loans to Mr. Pate had closed, Mr. Sandoval recorded a "Memorandum of Real Estate Contract" which disclosed only that the Vrabliks had the right to purchase the property.  Excerpts of Record ("ER") at 165.

ORDER – 4

OneWest acquired the second deed of trust and the underlying loan via a series of FDIC-supervised transfers in the wake of the mortgage crisis of the late 2000s. It is not clear how HSBC acquired the first deed of trust and underlying loan, although no one disputes that it did so.

### B. After Mr. Pate Fails to Pay the Loans, the Vrabliks Seek Bankruptcy Protection a Second Time.

Mr. Pate quickly defaulted on his obligations, leading HSBC to initiate foreclosure proceedings in June 2007. The Vrabliks managed to forestall the foreclosure, and they eventually filed a second bankruptcy petition. They later initiated an adversary proceeding against Mr. Sandoval, the Pates, other entities that assisted Mr. Sandoval in defrauding the Vrabliks, and HSBC and OneWest. Mr. Sandoval and his cohorts either did not appear in the adversary proceeding or scarcely defended themselves. The banks, by contrast, insisted that whatever the result of the Vrabliks' claims against Mr. Sandoval and his partners in fraud, the Vrablik property was subject to the deeds of trust securing the loans they (as successors to MortgageIt) made to Mr. Pate.

HSBC moved for summary judgment. After a December 7, 2011 hearing, the bankruptcy court convened a second hearing on December 21, 2011 to announce its ruling. The court ruled that HSBC was, as a matter of law, a bona fide purchaser (or a bona fide encumbrancer) of the property. The bankruptcy court observed that no one recorded any document that would have given MortgageIt notice of the Vrabliks' interest in the property. From the perspective of MortgageIt (and by extension, HSBC), it entered a standard owner-occupied residential real estate financing arrangement with Mr. Pate. Whatever interest the Vrabliks had, the court ruled, it was subordinate to HSBC's deed of trust. In January 2012, the bankruptcy court entered a brief written order confirming its oral ruling.

ORDER – 5

Later, OneWest filed an essentially identical motion for summary judgment. The bankruptcy court granted that motion as well, ruling orally on March 21, 2012, and confirming the oral ruling in writing the same day.

The banks then asked the bankruptcy court to certify its rulings as final judgments in accordance with Federal Rule of Civil Procedure 54(b). The bankruptcy court did so in July 2012. The Vrabliks appealed.

While their appeal was pending, they brought the remainder of their adversary proceeding to a close. In January 2013, they obtained a consent judgment of $150,000 against Mr. Sandoval and one of the entities he used to perpetuate his scam. They also obtained a declaratory judgment extinguishing the Pates' interests in their property. That judgment declared that it did not impact the banks' interests in the property.

So far as the court is aware, the bankruptcy court's June 2012 and January 2013 judgments reflect the current status of the property. The Vrabliks own it. They have no debt for which they are personally liable, because the only debts for which they were responsible were extinguished in their transaction with the Addepallis in 2005. But the banks have liens against their property that apparently exceed the property's value.

**C.    The Court Affirms the Bankruptcy Court's Judgment Because It Correctly Reflects the Banks' Interests in the Property.**

The court conducts de novo review of a bankruptcy court's grant of summary judgment. *In re Slatkin (Santa Barbara Capital Mgmt. v. Neilson)*, 525 F.3d 805, 810 (9th Cir. 2008). The court may affirm summary judgment on any basis that the record supports. *Id.*

In ruling that the banks were bona fide encumbrancers of the property, the bankruptcy court held that the banks had neither actual notice nor constructive notice of the Vrabliks' interest. In reaching that ruling, it implicitly relied on Washington's recording statute, which declares that unrecorded conveyances of real property are "void as against any subsequent purchaser in good faith and for a valuable consideration . . .

ORDER – 6

whose conveyance is first duly recorded." RCW 65.08.070. The bankruptcy court held that the banks, as MortgageIt's successors, had encumbered the Vrabliks' property in good faith, unaware of their unrecorded interest in the property. No one disputes that MortgageIt promptly recorded its deeds of trust.

The Vrabliks contend that the bankruptcy court erred in finding that MortgageIt encumbered their property in good faith. They argue that because they were in actual possession of the property when Mr. Pate took out the loans, the banks had constructive notice of that fact. They also argue that MortgageIt overlooked a number of irregularities when it made the loans. For example, they argue that recorded documents revealed that Mr. Pate had many residences, casting doubt on his claim that he would reside in the Vrabliks' home. They argue that MortgageIt knew or should have known that the $550,000 it lent greatly exceeded the value of the property, which had appraised for just under $350,000 in 2005.

As to whether MortgageIt made a sensible loan or not, the court need not take a position. MortgageIt (like many other lenders during that period) was free to make foolish loans. That MortgageIt made a risky loan is simply irrelevant to whether the Vrabliks have rights superior to the deeds of trust that secure that loan.

As to whether MortgageIt had constructive or actual notice of the Vrabliks' interest in the property, the court also need not take a position. The bankruptcy court explicitly rejected, in its oral ruling, the notion that the banks were charged with constructive notice of the Vrabliks' occupancy of the property. It was unwilling to conclude that banks have an obligation, in every case, to inquire independently into who lives in residential property used as security for a loan. It also rejected, albeit implicitly, the Vrabliks' contention that MortgageIt had enough information about Mr. Pate to at least create an issue of fact as to whether it had actual notice that he was not living in the home and would not be living there. This court, however, need not decide whether the bankruptcy court correctly decided issues relating to what notice MortgageIt had. Even if

ORDER – 7

MortgageIt had notice of the entire scam and Mr. Pate's role in it, it would not mandate a change in the bankruptcy court's ultimate judgment.

If MortgageIt had known of the scam in which Mr. Pate was participating, it would have known that the Vrabliks occupied the property in accordance with the Agreement for Deed. That Agreement acknowledged Mr. Pate's right to take out a new mortgage, and it acknowledged that any interest the Vrabliks had was subordinate to that new mortgage. The Vrabliks could purchase the property in accordance with the agreement, but the property would remain subject to the new mortgage. In other words, if MortgageIt had inquired, it would have discovered that it was free to loan Mr. Pate money and to secure those loans with first-priority deeds of trust. That is precisely what MortgageIt did. Perhaps if MortgageIt had known of the scam, it would have had the judgment not to make the loans, but that is beside the point. The Vrabliks never had an interest that was superior to the MortgageIt deeds of trust. It makes no difference whether MortgageIt entered those deeds of trust in good faith ignorance of the Vrabliks' interest.

The bankruptcy court's final judgment correctly reflects the status of the property. The Vrabliks are the property's legal owner. But their interest is subject to the deeds of trust in favor of MortgageIt, which are now deeds of trust in favor of HSBC and OneWest. The court need not decide if the banks (in their role as MortgageIt's successors)[3] were bona fide purchasers. The Vrabliks never had an interest in the property that was superior to the banks' liens. There is no reason to disturb the bankruptcy court's judgment.

Before concluding, the court notes that its judgment today makes it unnecessary to reach several of the banks' arguments. The court need not, for example, decide if the

---

[3] The court emphasizes that throughout this order, it has assumed that HSBC and OneWest have all rights that MortgageIt acquired via the deeds of trust. The Vrabliks occasionally suggest that the way in which the banks acquired the loans and deeds of trust is suspect, but they have not presented a cogent argument that they stand to benefit from any irregularities in the acquisitions.

ORDER – 8

banks are correct in asserting that the option that the Agreement for Deed created has expired. The Vrabliks have never attempted to exercise that option, and it would be irrational for them to do so, given the banks' liens on the property. The court also need not decide if the banks can benefit from equitable subrogation to whatever prior interests MortgageIt extinguished when it made the loans.

Finally, the court notes that when it issued its first substantive order on this appeal in May 2013, it ruled that the Vrabliks' challenge to the bankruptcy court's decision to certify Rule 54(b) judgments in favor of the banks was moot, and that even if it was not, the Vrabliks had failed to address the issue in their opening brief. The Vrabliks ignored that ruling when they rebriefed the appeal. Putting aside that they ignored the court's prior ruling, they again failed to present any argument to demonstrate either that the bankruptcy court erred in issuing Rule 54(b) judgments or that the bankruptcy court's later final judgment did not moot any error in issuing the Rule 54(b) judgments.

### III.   CONCLUSION

For the reasons stated above, the court AFFIRMS the judgment of the bankruptcy court. The clerk shall TERMINATE both this appeal and the motion calendar associated with it, but it shall not enter judgment at this time. The clerk shall ensure that the bankruptcy court receives notice of this order.

Before the court enters judgment for the banks, the court directs the parties to meet and confer to determine if they wish to exercise the following option. The consequence of the bankruptcy court's judgment (and this court's affirmation of that judgment) is to relieve the Vrabliks of the debt they once owed on their home. They are no longer personally liable on any loan secured by their property. Their property, however, is subject to liens upon which the banks may foreclose. If the banks choose to foreclose, it seems virtually certain that they will recoup only a small fraction of the face value of the loans. Because it appears the Vrabliks wish to remain in their home, the court suggests that the parties attempt to reach an agreement to refinance the home in a way that all

ORDER – 9

parties benefit.  They are not obligated to do so, but if they wish to do so, the court will attempt to appoint a judge to help them reach a resolution.  If the parties would like to take advantage of this option, they shall submit a joint statement no later than April 9, 2014.  If they do not submit a joint statement, the court will direct the clerk to enter judgment for the banks.

Dated this 25th day of March, 2014.

_____
The Honorable Richard A. Jones
United States District Court Judge

ORDER – 10